IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 4, 2001 Session

**STATE OF TENNESSEE v. MONTEA WILSON**

**Appeal from the Criminal Court for Shelby County**
**Nos. 99-03924, 99-03925      Chris Craft, Judge**

_____

**No. W2000-00748-CCA-R3-CD - Filed May 3, 2002**

_____

A jury convicted the defendant, Montea Wilson, of felony murder and attempted especially aggravated robbery. The trial court merged the attempted robbery conviction with the felony murder conviction and the jury sentenced the defendant to life without the possibility of parole. In this appeal of right, the defendant contends (1) that the evidence was insufficient; (2) that the trial court erred by failing to exclude certain evidence as unfairly prejudicial; (3) that defense counsel was erroneously prohibited from making a full opening statement; (4) that the trial court erred by denying a defense request for expert witness funds; (5) that prior robbery convictions were erroneously admitted for impeachment purposes; (6) that the trial court erred by limiting the testimony of defense witness Sammie Ballard; and (7) that the trial court erred by permitting certain testimony at a suppression hearing. Because there is no reversible error, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

James V. Ball (on appeal) and Gerald Skahan (at trial), Memphis, Tennessee, for the appellant, Montea Wilson.

Paul G. Summers, Attorney General & Reporter; John H. Bledsoe, Assistant Attorney General; and Jerry Kitchen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On December 2, 1997, there was an attempted armed robbery at Ace Check Cashing on Getwell Road in Memphis. At trial, the state submitted the prior sworn testimony of Janice Hogue, the Ace Cash Express Director of Security and Facility Management, who was employed in the corporate office. Ms. Hogue's testimony established that Ace Cash Express, a nationwide business with branches providing check cashing and money order services, generally used armored cars to deliver cash to each branch. The policy was to permit each branch to maintain a maximum level of

cash on the premises and, when that level was reached, employees were required to request special armored car pick-up services. At the end of each work day, any cash on hand was to be placed in a safe and the alarm activated. There were no security cameras. Ms. Hogue's testimony was that the victim, Cecil Wayne Goldman, who managed the branch located on Getwell Road, set the alarm system at 6:47 p.m. and had 90 seconds to exit the building. The branch had approximately $27,000 in cash at closing, an unusually large amount.

Shirley Smith testified that on the evening of the offenses, she was entering the Wendy's restaurant on Getwell when she heard several individuals arguing loudly at Ace Check Cashing next door. She saw two young black men with the victim in front of the business and overheard one of the black men say, "You dumb ass . . . ." There were three gunshots and the victim fell to the ground. The black men left the scene on foot, crossing through the Wendy's parking lot towards the Greenwich Square apartments. The victim, who was carrying papers and office supplies in a cardboard box, had been shot and was bleeding. Ms. Smith recalled the gunman was wearing a dark blue jacket.

Dr. Thomas Deering performed an autopsy on the victim. He testified that the victim died of multiple gunshot wounds. A shot to the abdomen, which struck the victim's aorta, would have been fatal and, according to Dr. Deering, caused a loss of consciousness within four to five minutes. Although Dr. Deering could not determine the number of bullets that may have been involved in the shooting, he found four entrance wounds and four exit wounds.

Officer Cham Payne of the Memphis Police Department Crime Scene Unit processed the scene. He testified that he and other unit officers found a set of keys, blood on the surrounding concrete, three .380 bullet casings, and one spent bullet. Officer Payne estimated that the Wendy's restaurant, where Ms. Smith witnessed the attack, was 100 yards from the scene. He testified that the shell casings were not checked for fingerprints, explaining that semi-automatic weapons slide the bullets into the magazine, typically destroying any fingerprints. The officer stated that the heat generated by the firing of a weapon also obliterates fingerprints.

Three days after the shooting, Officer Mark Rewalt, also of the Memphis Police Department Crime Scene Unit, he recovered an unloaded .380 semi-automatic pistol from a trash can at a bus stop in front of Clark Towers on Poplar Street. The gun had been placed in a bag.

Quiana Payne, who lived in the Greenwich Square apartments and considered the defendant to be her boyfriend, testified that on the evening of the murder, she contacted the defendant on his cellular telephone. He responded that he was "taking care of business" and would call back, then immediately hung up. Three days later, Ms. Payne saw the defendant at the residence of Anita Hunter, where he lived. She recalled that the defendant packed clothes and a black-handled .380 semi-automatic pistol into a gym bag. Later, when she learned of the defendant's involvement in the victim's murder, she returned the bag to Ms. Hunter's residence. Ms. Payne also identified the .380 pistol recovered by Officer Rewalt as that of the defendant. She stated that the defendant was driving a burgundy Mazda 929.

During cross-examination by the defense, Ms. Payne acknowledged that she met the defendant through her past employment as an entertainer at the Pure Passion club. She testified that she learned after the murder that the defendant was dating three other women at the same time he dated her. Ms. Payne stated that she had called the defendant at exactly 6:53 p.m. on the date of the shooting, maintaining that she recalled the time because it was so unusual for him to hang up on her.

Officer Bryant G. Jennings, a member of the Memphis Police Department Crime Scene Unit, executed a search warrant at the apartment shared by Anita Hunter and the defendant. He stated that officers seized a small safe, a small piece of black cloth with cut-out holes, and a pair of black gloves.

Don Carman, a specialist in forensic firearms identification with the TBI Crime Laboratory, examined a black-handled pistol found by officers in a gym bag in the defendant's apartment. He described the weapon as a .380 semi-automatic manufactured by Davis Industries. The magazine held five bullets. Agent Carman stated that unless the gun jammed, it would eject shell casings when fired. He was unable to connect any of the shell casings found at the scene to the black-handled Davis .380. Agent Carman, who also examined the Morrison .380 semi-automatic recovered from the bus station trash can, testified that while shell casings ejected by the gun had similar markings to those recovered at the scene, the quality of the markings was insufficient for him to reach any definite conclusions. He affirmatively concluded that the Morrison .380 had fired the spent bullet found at the murder scene.

Darius Bowles, indicted for the same offenses as the defendant, testified that he first met the defendant, whom he also knew as "LA," in December of 1997 through his cousin, Javon Webster.[1] He stated that on the day of the murder, the defendant, accompanied by Webster and Vincent Broddy, picked him up in a maroon Honda and drove around for approximately two hours before arriving at the defendant's apartment in Greenwich Square at approximately 6:00 p.m. He testified that the defendant, who claimed to be a member of the International Black Mafia, planned the robbery of the Ace Check Cashing, arranged everyone's participation, and discussed a four-way split of the proceeds. Bowles stated that the defendant provided him and Webster with weapons, instructing him to be a "look-out" for Webster, who was to apprehend the victim. He claimed that the defendant developed a plan whereby Webster was to confront the victim outside, return him to the store, and force the surrender of the cash. Bowles recalled that the defendant believed they could recover $50,000 to $75,000 in cash. He identified the Morrison .380 recovered from the trash can by Officer Rewalt as the one given to Webster and the black-handled .380 as the gun he was provided.

According to Bowles, the men positioned themselves outside of the store at 6:30 p.m. to wait on its closing. He testified that he and Webster were stationed in bushes outside of Ace Check

---

[1]Javon Webster was convicted of felony murder and attempted especially aggravated robbery as a result of these offenses. This court affirmed his convictions on February 7, 2002. See State v. Javon Webster, No. W2000-01912-CCA-R3-CD (Tenn. Crim. App., at Jackson, Feb. 7, 2002).

Cashing with Jasper Temple, who lived in the Greenwich Square apartment complex and who had agreed to participate in the robbery. Temple used a walkie-talkie to communicate with the defendant and Broddy, who were located across the street. Bowles testified that he was wearing a blue Adidas sweatshirt, gray jogging pants, and black and white Air Jordan tennis shoes. The other members of the group were generally wearing dark clothing. Bowles recalled that when the defendant provided the code word "A-okay" over the walkie-talkie, Webster ran to the door of Ace Check Cashing. Bowles, who followed Webster, contended that the victim "started hollering," panicked, and threw a box at Webster. Webster wrestled briefly with the victim and, as Temple yelled, "Shoot him," shot three to four times. Bowles testified that after the shooting, he ran through a field and the Wendy's restaurant parking lot to the Greenwich Square apartments. Afterward, the five men met at a green generator in the complex, where he and Webster returned their guns to the defendant. Bowles contended that he asked Webster why he shot the victim and Webster was unable to explain. He estimated that the men waited for approximately 30 minutes before the defendant drove them home. The defendant said, "Just be cool," and informed him that he would telephone the next day. Bowles was arrested three days later and showed police where to find the defendant. While acknowledging that he had belonged to a gang, Bowles contended that he committed the crimes for money and that they were not gang-related.

During cross-examination, Bowles maintained that he had joined the Crips gang in early 1997 and quit midway through the year. He denied that he had ever achieved a rank in the gang or "thrown" gang signs. Bowles agreed, however, that Webster, Broddy, and Temple were Crips. He admitted telling police that his cousin, Webster, had stated that he intended to rob Ace Check Cashing and invited him along. He also acknowledged that he initially lied to police by telling them that he did not know his cousin's last name. Bowles agreed that he did not mention Broddy in his first statement to police, but denied that he had protected him out of gang allegiance. He testified that the defendant, at the time of the offenses, was dressed in jeans, a silver coat, and tennis shoes.

Robert White, a patrol officer with the Memphis Police Department, testified that he, Officer Sammie Ballard, and others arrested the defendant at his girlfriend's apartment in Greenwich Square. He testified that the defendant was not there when they arrived, but later drove into the parking lot. Officer White stated that when police approached, the defendant fled on foot. He was finally apprehended on a stairway landing.

Captain John A. Wilburn, who was a sergeant in the Memphis Police Department homicide division at the time of the murder, testified that he took a recorded statement from the defendant on December 11. When he learned that the defendant wanted to talk, he checked him out of jail and transported him to the homicide offices. After being advised of and waiving his Miranda rights, the defendant gave the following statement:

> After I got back from Mississippi, me and [Broddy] drove into Greenwich Square apartments and I run into [Webster] and [Bowles], "[T]ip" and Billy all standing around outside in the back of the cove. We all were sitting out there talking for a second. Webster decided that they wanted to go and rob the check cashing place over

there on Getwell. [Webster] asked if anybody had any units (guns). [Broddy] said, "Yeah, I got a .380." I said, "Well, I got a gun too." So, [Webster, Bowles], Billy and Tip decided they would go rob the check cashing place. They asked me if I would watch out for the police. [Bowles] had already had the walkie-talkie's and we were playing with them outside.

[Broddy] gave [Webster] his .380 and I had a .380 that I gave to [Bowles]. Billy went inside his house and put on some black clothes, [Broddy] had already had on some black (clothes), and Billy, [Webster, Bowles], Tip and [Broddy] walked down to the check cashing place. When they walked down there, [Bowles] had a walkie-talkie[;] [Broddy] had a walkie-talkie. [Broddy] and Billy were gon' stand on the opposite side of the street, and Tip and [Webster] and [Bowles] were gon' be in the bushes, and I was gon' ride up the street and see if I saw any police. If I saw the police, I was instructed to blow the horn.

I rode up Getwell to Amoco gas station, turned around, I came back to the Greenwich Square apartments. Then I rode back up to the Amoco gas station. As I was riding back up to the Amoco gas station, I heard three (3) shots go off. When I looked over toward the check cashing place, I saw [Webster] struggling with the guy that was inside . . . . That's when the guy had a box or something . . . I saw that fly up in the air. That's when I heard the shots. I saw Webster shoot the guy three (3) times. My window was down, I heard the guy hollering for help, and he was screaming.

I drove on down to American Way, made a left and went down to Lamar, came back up to Knight Arnold, made a left and came back around to Getwell. Went back to Greenwich Square apartments. That's when they all came running back over there. That's when [Bowles, Webster, Broddy], Billy and Tip came running back over there to the apartments. They came inside my sister's apartment, and [Webster] said, "Man, I didn't get no money. The guy was grabbing on me." We sat around there and we talked for a couple more minutes. Everybody got scared. I went outside, me and [Broddy] were outside and security guards were telling us that they were looking for some guys dressed in black, for us to go in the house.

Billy went home, Tip went home and I took [Webster] and [Bowles] home. [Webster] took the gun with him, the .380 that he used. The other gun was left there at my sister's apartment. [Bowles] took the walkie-talkie's back to the guy that loaned them to him.

Captain Wilburn executed a search warrant at the defendant's apartment on December 9, one week after the murder. During the search, he and other officers seized a black bag containing a black jumpsuit and a smaller black bag with the black-handled .380 inside.

Memphis Police Department Officer Sammie Ballard, called as a defense witness, testified that on the day following the murder, he and other officers canvassed the scene, including Greenwich Square, looking for suspects and passing out Crime Stoppers cards. Officer Ballard recalled that two days later, at approximately 9:00 a.m., police received information which lead to the arrest of Webster and Bowles. Another tip led to a handgun in a trash can on Poplar Street. Officer Ballard testified that when the defendant was arrested, he gave them information implicating Webster and Bowles.

Dr. Carl Nelson, who qualified as an expert on gang affiliation, testified that he was employed by the Tennessee Department of Correction at the Memphis Correction Center. He stated that he had interviewed the defendant and that it was his opinion that the defendant was not a gang member. According to Dr. Nelson, there is no gang known as the International Black Mafia. He explained that the Crips originated in Los Angeles in approximately 1969 or 1970 and that the gang had moved eastward to sell illegal drugs. Dr. Nelson described the Crips as having no national structure but being tightly run at the local level, with fellow gang members referring to one another as "cousins." He stated that the Crips made a practice of blaming their crimes on rival gang members or snitches that they were able to befriend. During cross-examination by the state, Dr. Nelson conceded that the defendant had not necessarily been falsely accused because he was implicated by gang members. He also acknowledged that he did not confer with anyone involved in the crime other than the defendant.

Anita Hunter testified that at the time of the offenses, the defendant was living with her in her Greenwich Square apartment. She stated that she and the defendant were "friends" and acknowledged that the defendant had two to three other girlfriends. Ms. Hunter recalled that when she returned home after work at approximately 5:30 p.m. on the day of the murder, the defendant was not there, but that he was acting normally when he returned at 9 or 9:30 p.m. At approximately 10:30 p.m., she left for work and could not remember whether the defendant was at the apartment when she returned the next morning. Upon cross-examination by the state, she confirmed that on the date of the murder, the defendant, pursuant to her request, was in the process of moving out of her apartment.

Denise Wright, who was dating the defendant in December of 1997, testified that at that time, the defendant was living with Anita Hunter, whom she believed to be his sister. She recalled that she visited that apartment on five or ten occasions and would occasionally spend the night. Ms. Wright testified that she had once seen the Morrison .380 police found in the Poplar Street trash can. It was on a night stand in the den at the apartment. The defendant and Broddy were the only others present. Ms. Wright claimed that on the day of the murder, the defendant was at her apartment from approximately 5:00 or 5:30 p.m. until 9:00 p.m except for a period of ten or 15 minutes at 6:45 p.m. when he left after receiving a cellular telephone call or page. Ms. Wright contended that because employees of the district attorney's office had tried to confuse her during pre-trial questioning, her statement contained error regarding the timing of various events. She maintained that her trial testimony was truthful.

During cross-examination, Ms. Wright acknowledged that she had reviewed her pre-trial statement and had not asked for corrections. She claimed that the black-handled .380 found in the gym bag in the defendant's apartment was hers, as was the car the defendant was driving on the day of the murder. She admitted that in her prior statement, she told authorities that the defendant and Broddy had accompanied her to Mississippi on the day of the murder to pick up her child, leaving at approximately 3:00 p.m. and returning an hour and one-half later. Ms. Wright acknowledged that she told investigators that she had loaned the defendant her car for the remainder of the day and that he brought it back to her at approximately 8:00 p.m. She also acknowledged that she had initially stated that she then drove Broddy and the defendant home, drove back to her apartment briefly, and then returned to the defendant's apartment.

The defendant, who was 28 years old at the time of trial, testified that his real name was Marcus Montea Floyd. He acknowledged that he had been convicted of theft in 1991, robbery twice in 1993, and criminal impersonation in 1997. The defendant stated that in November and December of 1997, he lived with Anita Hunter, with whom he had had a prior sexual relationship. He acknowledged that during that time, he simultaneously dated several women without advising any of them of his multiple relationships. He and Ms. Hunter referred to one another as "brother" and "sister." The defendant testified that at the time of the offenses, he had known Vincent Broddy for approximately one month and the remainder of those involved for a matter of weeks. He maintained that the gun used by Webster belonged to Broddy and that the one used by Bowles belonged to Denise Wright. The defendant stated that on the day of the murder, he awakened at 5:15 or 5:30 a.m. to call in to work because he was not feeling well. He claimed that he then drove Denise Wright to her residence and returned to his apartment to sleep. The defendant testified that at approximately 11:30 a.m., Broddy, Webster, and Bowles arrived at his apartment and asked whether he still had the gun belonging to Ms. Wright. Contending that he was not in a gang and had never heard of the International Black Mafia, he accused Broddy, Webster, Bowles, and Temple of being members of the Crips gang. The defendant claimed that he gave the gun to Bowles without asking the three men their intentions and that the men left his apartment at approximately 12:30 p.m. He stated that he remained at his apartment until returning to Ms. Wright's residence at approximately 5:00 p.m. The defendant stated that he stayed at Ms. Wright's for two to three hours before leaving for ten to 15 minutes after receiving multiple pages from Quiana Payne. He explained that he went to a local store to purchase cigarettes and call Ms. Payne and then returned to Ms. Wright's apartment where he watched television for the remainder of the evening.

The defendant testified that during the next two days, he saw police officers canvassing the area, passing out fliers and Crime Stoppers information. He stated that three days after the murder, he called Crime Stoppers and identified Webster and Bowles as the assailants. The defendant contended that he would not have called Crime Stoppers had he committed the crimes. He claimed that after conversing with Officer Ballard several times that day, he acquired the Morrison .380 from Broddy, wrapped it in a plastic bag, and placed it in a garbage can on Poplar for police. The defendant testified that he acknowledged to Officer Ballard that "LA," was his nickname, which stood for "Ladies All the Time." The defendant claimed that he drove to Ms. Hunter's apartment to return her car and was arrested by police. He testified that he gave officers the alias Montea

Wilson because he had a prior record in his own name. The defendant contended that the statement that he gave police on December 11 was false because he "wanted to give them everything that they wanted at that particular time." He maintained that they wanted him to place himself at the scene so that he would be a good witness and that he acquiesced in their request. The defendant denied any role in planning the offenses.

During cross-examination, the defendant claimed that he had falsely testified at a suppression hearing that he was at Anita Hunter's apartment at the time of the offenses. He also acknowledged that he had lied during his direct examination by testifying that his two prior robbery convictions were for offenses occurring on the same date. The defendant admitted that his resume indicates that he graduated from Crenshaw Senior High in California when he actually failed to complete high school at Jackson Central Marion in Jackson, Tennessee. He testified that he lied extensively in his first statement, at which time he told police that he was in Mississippi at the time of the crimes and that Webster and Bowles had confessed to the murder while riding around in a car. The defendant contended that he gave a second statement admitting his own involvement only because the police told him that his first statement was "no good" because he was not at the scene. He explained that he lied at the suppression hearing only because he was concerned about being charged with perjury and wanted his testimony to be consistent with his second statement.

Lieutenant Raymond H. Hopkins of the Memphis Police Department, who works with Crime Stoppers, testified that Crime Stoppers keeps records of all tips received and forwarded to investigators. Callers are given secret codes to ensure their anonymity, then asked to call back later. Lieutenant Hopkins identified tip number 016542 as having been telephoned in at 9:10 a.m. on December 5, 1997. He stated that the tipster gave the names of two suspects in the Ace American Check Cashing incident, Javon and Pookie, and said that they had committed the crime in order to prove their loyalty to the Crips gang. Lieutenant Hopkins testified that the caller stated he had received his information from the suspects. In response to questioning by the state, he acknowledged that he had no knowledge whatsoever of the identity of the caller.

I

The defendant first asserts that because the state's evidence against him consisted solely of the uncorroborated testimony of accomplice Darius Bowles, it was insufficient to sustain his conviction for felony murder. The state argues otherwise.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well

as all factual issues raised by the evidence are resolved by the trier of fact. <u>Liakas v. State</u>, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. <u>State v. Evans</u>, 838 S.W.2d 185, 191 (Tenn. 1992).

A defendant cannot be convicted upon the uncorroborated testimony of accomplices. <u>Sherrill v. State</u>, 204 Tenn. 427, 433-35, 321 S.W.2d 811, 814-15 (1959); <u>Prince v. State</u>, 529 S.W.2d 729, 732 (Tenn. Crim. App. 1975). An accomplice is defined as a person who knowingly, voluntarily, and with common intent with the principal offers to unite in the commission of a crime. <u>Clapp v. State</u>, 94 Tenn. 186, 194-95, 30 S.W. 214, 216 (1895); <u>Letner v. State</u>, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974). The rule is that there must be some fact testified to which is entirely independent of an accomplice's testimony; that fact, taken by itself, must lead to an inference that a crime has been committed and that the defendant is responsible therefor. <u>State v. Fowler</u>, 213 Tenn. 239, 245-46, 373 S.W.2d 460, 463 (1963). This requirement is met if the corroborative evidence fairly and legitimately tends to connect the accused with the commission of the crime charged. <u>Marshall v. State</u>, 497 S.W.2d 761, 765-66 (Tenn. Crim. App. 1973). Only slight circumstances are required to furnish the necessary corroboration. <u>Garton v. State</u>, 206 Tenn. 79, 91, 332 S.W.2d 169, 175 (1960). To be corroborative, the evidence need not be adequate in and of itself to convict. <u>See</u> <u>Conner v. State</u>, 531 S.W.2d 119, 125 (Tenn. Crim. App. 1975).

Initially, the defendant does not challenge his underlying felony conviction of attempted especially aggravated robbery. Tennessee Code Annotated section 39-13-202 provides in pertinent part as follows:

> (a) First degree murder is:
>
>              *        *        *
>
> (2) A killing of another committed in the . . . attempt to perpetrate any . . . robbery, . . . .

Tenn. Code Ann. § 39-13-202(a)(2).

Darius Bowles testified that on the day of the crimes, he, the defendant, Broddy, and Webster went to the defendant's Greenwich Square apartment, where the defendant planned a robbery of the Ace Check Cashing business and provided weapons. He testified that the defendant claimed that he had been watching the business and that the cash on hand was substantial, testimony corroborated to a degree by the approximately $27,000 in the safe. Denise Wright, one of the defendant's girlfriends, testified that she had loaned her maroon car to the defendant the day of the crimes. Ms. Wright also claimed ownership of the black-handled .380 that Bowles claimed to have received from the defendant and recalled having seen the Morrison .380 in the defendant's apartment shortly before the murder. The defendant led police to the Morrison .380. The black-handled .380 was found in the defendant's apartment in a bag that also contained black clothing consistent in appearance with clothing described by Bowles. Finally, the defendant admitted to police that he participated in the

robbery. While there was contradictory evidence, there was corroborative evidence connecting the defendant with the crimes. The jury accredited the testimony of the state's witnesses, as was its prerogative. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995).

The proof established that Webster fired the fatal shots. A person may be held criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(1) (1991). Mere presence during the commission of a crime is not sufficient. "Presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). One need not complete any particular act or take physical part in the crime. Id. There was evidence at trial that the defendant planned the robbery, solicited the involvement of the others, armed two of the participants, orchestrated the events via walkie-talkie, and intended to share in the proceeds. In our view, that was far more than mere presence and was sufficient evidence for a jury to find beyond a reasonable doubt that the defendant was criminally responsible for the felony murder of the victim.

II

Next, the defendant asserts that the trial court erred by denying his motion in limine to exclude the black mask, black gloves, and black jumpsuit recovered by police from his apartment. The defendant argues that the evidence was irrelevant because the state failed to show that any of the items of clothing were used in the attempted robbery and murder. He also contends that the prejudicial effect of the evidence substantially outweighed any probative value. The state responds that the evidence was properly admitted as relevant to identity.

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" than it otherwise would be. Tenn. R. Evid. 401. Generally, all relevant evidence is admissible. Tenn. R. Evid. 402. At the discretion of the trial court, however, relevant evidence may be excluded if it presents a danger of unfair prejudice:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403. This court must not reverse the trial court absent an abuse of discretion. See State v. Stout, 46 S.W.3d 689, 700 (Tenn. 2001).

In our view, the trial court properly admitted evidence of the gloves and jumpsuit. Although the defendant correctly points out that neither Webster nor Bowles was wearing black at the time of the robbery, there was testimony that others involved either were already wearing black clothing or

had changed into black clothing. The defendant's apartment was utilized for the planning of the robbery and for regrouping afterward. The jumpsuit was in a bag with one of the guns used in the robbery and was corroborative of other testimony. The officers' discovery of the black jumpsuit and black gloves in the apartment was, therefore, relevant and evidence thereof was not unfairly prejudicial.

The black cloth with holes, referred to as a mask, presents a more difficult issue. In our view, the trial court should have granted the defendant's motion in limine to exclude the black mask. There was no evidence of any kind that masks were used in the commission of the crimes. That the defendant possessed the item was irrelevant and, in fact, could have been construed by the jury as evidence of the defendant's involvement in other crimes. Given the overwhelming nature of the evidence against the defendant, however, it is our view that the error was harmless, having no effect on the results of trial.

### III

The defendant next argues that the trial court erred by limiting his counsel's opening statement at trial. There is little information regarding this issue in the record. Although not included in the record, the state apparently filed a motion in limine seeking to exclude certain of the defendant's statements to law enforcement officers. While there is no order or other pronouncement by the trial court indicating its action on the motion, the ruling evidently had the collateral effect of limiting defense counsel's opening statement. The defense response to the state's motion was that the challenged statements were not hearsay and, being exculpatory, should be considered by the jury along with the defendant's inculpatory comments. While reviewing its rulings on various motions in limine just prior to trial, the trial court clarified its limitations on defense counsel's opening statement:

> [Defense Counsel] is going to be allowed to tell the jury in opening statement if he wishes that the defendant . . . inculpated his co-defendants in a statement to the police. . . . In other words, he turned them in.
>
> He can't talk about the substance of that statement, but he can ask the state witnesses on cross-examination . . . [whether the defendant] turn[ed] them in to establish a bias, a reason, for those co-defendants to rat on him.
>
> *       *       *
>
> In any event, [defense counsel] has a right to tell the jury . . . that his defense is . . . that these co-defendants turned him in because he turned them in, and they're bias[ed] against him.

Shortly into his opening statement, defense counsel commented, "The proof is going to show [the defendant] made a call to Crime Stoppers." At a bench conference following an objection by the state, the trial court instructed defense counsel not to "mention the [defendant's calls to] Crime Stoppers." In doing so, the trial judge observed that the limitation was based on the inability of

Officer Ballard, who had taken the calls, to lay a foundation for their admission by identifying the defendant as the caller.

The purpose of the opening statement has been described as a means of informing the jury, in a general way, of the nature of the case, the underlying theories, and the essential facts to be placed into proof. Harris v. Baptist Memorial Hospital, 574 S.W.2d 730, 732 (Tenn. 1978). Tennessee Code Annotated § 20-9-301 provides every party, in either a civil or criminal case, with the right "to make an opening statement to the court and jury setting forth [its] . . . contentions, views of the facts and theories of the lawsuit." Trial courts are afforded considerable authority in controlling the opening statements of counsel and will not be reversed absent an abuse of discretion. State v. Stout, 46 S.W.3d 689, app. at 713 (Tenn. 2001); State v. Kimberly Wolfe, No. 122 (Tenn. Crim. App., at Knoxville, March 13, 1991).

Here, it is difficult to determine what limitations the trial court placed on defense counsel's opening statement other than the reference to Crime Stoppers. In our view, the trial court did not abuse its discretion by imposing such a narrow limitation. As the trial court indicated in its ruling, Officer Ballard was unable to identify the defendant as the Crime Stoppers caller who reported Webster and Bowles. That the jury would hear such evidence depended upon whether the defendant chose to testify. The trial court did not prohibit defense counsel from advancing the theory that the defendant was implicated in the crimes only because those actually involved were angry at his reporting them to police. Further, the record suggests that defense counsel actually, and perhaps prematurely, terminated his opening statement. After the state's initial objection and the bench conference thereon, defense counsel resumed his opening. When the state lodged a second objection, defense counsel unilaterally ended his remarks. The defendant, of course, has the burden or providing an adequate record for review of an issue. Without more information, this court cannot assess any error to the trial court.

IV

The defendant next contends that the trial court erred by denying his pre-trial ex parte motion for funds to hire an expert in the field of confessions. The state argues that the defendant has failed to demonstrate that the ruling denied him a fair trial.

Initially, the record does not contain the defendant's motion or any transcripts of any hearings on the matter. While there is the state's motion for a sealed transcription of the ex parte hearing on the request for an expert or investigative services, that document is general in nature and provides no case-specific information. The trial court's order, which is sealed, provides generally that the defendant failed to demonstrate a particularized need for a confession expert. Again, it is the duty of the appellant to supply an adequate record for a determination on the merits. State v. Price, 46 S.W.3d 785, 812 (Tenn. Crim. App. 2001). Otherwise, a claim must be treated as waived.

Despite any waiver, the record suggests that the type of expert sought by the defendant, a general authority in the field of confessions, might invade the province of the jury as the arbiter of credibility.

In his brief, the defendant concedes that there were substantial inconsistencies between his pretrial statements and his trial testimony, but asserts that the statements were false and coerced by police. He argues that

> [w]ith the number of statements and contacts with police after his arrest, . . . funds for an expert regarding confessions would have leveled the playing field . . . by allowing him to present crucial facts which speak to his belief that he was threatened with the death penalty and how this psychologically impacted him to cooperate with his jailers.

Our supreme court addressed an analogous issue in State v. Coley, 32 S.W.3d 831 (Tenn. 2000). In Coley, the trial court refused to admit the testimony of an expert in the field of eyewitness identification proffered by the defense. Concluding that the testimony was inadmissible per se, a majority of our high court ruled that the exclusion was proper:

> Here, as in Ballard, we are presented with testimony of a general nature designed to affect the juror's decision on the credibility of witnesses. Using the Ballard rationale, expert testimony concerning eyewitness identification "solicits the danger of undue prejudice or confusing the issues or misleading the jury . . . ." Id. at 561. As a result, it may "lead a jury to abandon its responsibility as fact finder and adopt the judgment of the expert," rather than "assist" the jury in making its own determination of credibility. See [i]d.
>
> *        *        *
>
> Governed by the fundamental principles of McDaniel, and the rationale of Ballard and Dyle, we find that expert testimony concerning eyewitness identification simply offers generalities and is not specific to the witness whose testimony is in question. Moreover, we are of the opinion that the subject of the reliability of eyewitness identification is within the common understanding of reasonable persons. Therefore, such expert testimony is unnecessary. It may mislead and confuse, and it could encourage the jury to abandon its responsibility as fact-finder. Such responsibility is a task reserved for and ably performed by the jury, aided by skillful cross-examination and the jury instruction promulgated in Dyle when appropriate. For these reasons, we find that general and unparticularized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness whose testimony is in question, does not substantially assist the trier of fact. Thus, we hold that such testimony is inadmissible under Tenn. R. Evid. 702 and that the trial court, therefore, properly excluded Johnson's testimony.

Id. at 835, 837-38; see also State v. McKinney, ___ S.W.3d ___, No. W1999-00844-SC-DDT-DD, slip op. at 6 (Tenn. 2002) (observing that expert testimony on eyewitness identifications is per se inadmissible and holding that defendant had failed to show due process violation).

-13-

In <u>State v. Smith</u>, 42 S.W.3d 101 (Tenn. Crim. App. 2000), the trial court allowed a DCS investigator and a police officer to testify that criminal suspects, as a matter of course, generally initially deny any wrongdoing. A panel of this court held that admission of that testimony as expert testimony was error:

> We conclude that the challenged testimony . . . that criminal suspects typically deny committing offenses before confessing during police interrogation was not admissible as expert testimony. First, the testimony was simply not relevant. Rule 401 of the Tennessee Rules of Evidence states that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, the general behavior of other criminal suspects during questioning by police had no value in the determination of whether Defendant was guilty of the offenses for which he was charged in this case. Second, evidence about the behavior of criminal suspects in other cases did nothing to assist the trier of fact to understand the evidence or determine a fact in issue. . . .

<u>Id.</u> at 112.

In our view, the testimony of the confessions expert sought by the defendant would have been inadmissible under the rationale expressed in <u>Coley</u> and <u>Smith</u>. The credibility of witnesses is a matter solely within the province of the jury. <u>See</u> <u>State v. Pappas</u>, 754 S.W.2d 620, 623 (Tenn. Crim. App.1987). Because truthfulness is within the understanding of reasonable persons, unparticularized expert testimony regarding confessions would not be of substantial assistance to the jury. <u>See</u> Tenn. R. Evid. 702. Rather, such testimony poses a danger of confusing the jury and "could encourage the jury to abandon its responsibility as fact-finder." Here, the defendant testified extensively regarding his statements to police and the truthfulness thereof. He presented testimony that the statements were false and that he felt compelled to make them in order to cooperate with police and avoid prosecution and the death penalty. The denial of funds for a confessions expert was proper.

### V

Next, the defendant argues that the trial court erred by permitting the state to impeach him with two 1993 robbery convictions. The state contends that the convictions were properly admitted.

Rule 609 of the Tennessee Rules of Evidence provides in relevant part as follows:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:
> \*     \*     \*
> (2) The crime must be punishable by death or imprisonment in excess of one

year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 609(a)(2) – (3).

In determining whether the probative value of a prior conviction on the issue of credibility is outweighed by its prejudicial effect on the substantive issues, a trial court should "(a) 'assess the similarity between the crime on trial and the crime underlying the impeaching conviction,' and (b) 'analyze the relevance the impeaching conviction has to the issue of credibility.'" State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992) (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9 (2d ed. 1990)). A trial court's ruling under Rule 609 will not be reversed absent an abuse of discretion. See Johnson v. State, 596 S.W.2d 97, 104 (Tenn. Crim. App. 1979).

Initially, our high court has recognized that robbery convictions are probative of credibility. See State v. Caruthers, 676 S.W.2d. 935, 941 (Tenn. 1984). Here, the defendant does not challenge the procedural basis for the admission of his robbery convictions. Rather, he claims that the unfair prejudicial effect of the convictions outweighs their probative value because of their similarity to the attempted especially aggravated robbery for which he was on trial. The fact that the defendant's prior conviction is similar in nature to the offense for which he is being tried does not, however, bar the use of the conviction to impeach him as a witness. See State v. Miller, 737 S.W.2d 556, 560 (Tenn. Crim. App. 1987). Because no transcript of any hearing that may have been held by the trial court appears in the record, we do not have the benefit of the trial court's balancing analysis. Nevertheless, we cannot conclude that the trial court abused its discretion by admitting the convictions for impeachment purposes. Here, the credibility of the defendant was a key issue at trial, with the defendant having provided more than one version of the events surrounding the offenses and having both admitted and denied involvement. Contrary to argument contained in the defense brief, no details of the prior convictions were introduced during the guilt phase of the trial. Thus, the prejudicial impact of any similarity between the offenses was mitigated by the jury's learning only that the defendant had two prior robbery convictions. Moreover, any error in admitting the convictions for impeachment purposes was harmless given the overwhelming evidence of the defendant's guilt.

## VI

The defendant next argues that the trial court erred by excluding certain testimony of Officer Sammie Ballard. The state responds that the proffered testimony was hearsay. Generally, hearsay evidence is inadmissible. Tenn. R. Evid. 802. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c).

During a jury-out hearing, the defendant proffered testimony by Officer Ballard that he took a Crime Stoppers call from a "male black . . . who later said he was [the defendant]." Officer Ballard testified that he could not "say for a fact that [the caller] was [the defendant]," and that he later "heard [the defendant] saying that he was the caller." The trial court then ruled that Officer Ballard's Crime Stoppers testimony was inadmissible:

> [T]his witness can't say that this is [the defendant] that called him. And so any conversation that he had with this person over the phone we cannot ask him what was said over the Crime Stoppers call.
>
> \*       \*       \*
>
> I just want to make sure that we don't have any statements put in the record in front of the jury that [the defendant] says he made a Crime Stoppers call because that's hearsay to no purpose.

In our view, the trial court correctly prohibited Officer Ballard from testifying to the identity of the Crime Stoppers caller. In our view, the statements made by the caller qualified as hearsay and were not subject to any exception. Moreover, although Officer Ballard's testimony regarding the call was excluded, the defendant testified that he called Crime Stoppers, reciting both the phone number he called and the identification number he received. Thus, the information was actually presented to the jury and properly considered during deliberation. Any error by the exclusion would have been harmless.

The trial court also excluded as irrelevant testimony by Officer Ballard that the defendant offered police leads regarding a November 5th murder at a McDonald's restaurant. While that evidence may be relevant with regard to sentencing, see Tenn. Code Ann. § 40-35-113(9), the trial court's ruling that it did not have any tendency to make it more or less probable that the defendant was involved in the offenses would be accurate, see Tenn. R. Evid. 401.

## VII

As his final issue, the defendant asserts that the trial court erred by permitting his testimony as to the facts of the case at a suppression hearing, rather than limiting the testimony to the voluntariness of the statements. The defendant cites no authority in support of his claims. Rather than directing this court to any specific testimony, the defense brief cites volumes six and seven of the record in their entirety. Because the defendant has the obligation to provide legal authority for his position and must make specific references to the record, identifying with particularity the testimony in question, the issue is waived. See Tenn. Ct. Crim. App. R. 10(a).

Further, the record reflects that the trial court questioned defense counsel about his line of questioning:

THE COURT: Well, my concern . . . and I'm just saying this as far as I understand now [the assistant district attorney general] can cross[-]examine him about this whole case. I didn't know if you're just getting into the part about the statements or what we're trying to do, but –

[DEFENSE COUNSEL]: Well, I'm leading up to the – to why he made these phone calls and things like that.

\*      \*      \*

THE COURT: Well, . . . the phone calls aren't that relevant to the statements unless your going to tie it in.

\*      \*      \*

THE COURT: But that's fine, you can put on whatever proof you want to put on.

[DEFENSE COUNSEL]: Yeah, I'm going to try to tie it in here.

At trial, there was no objection to the state's cross-examining the defendant about his suppression hearing testimony. See Simmons v. United States, 390 U.S. 377, 394 (1968) ("[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection."); State v. Roberge, 642 S.W.2d 716, 718 (Tenn. 1982) ("Further, one accused of a criminal offense may testify at a suppression hearing without incurring the risk that his testimony will be used against him by the prosecution as part of its case in chief."). Because defense counsel did not take "action . . . to prevent or nullify the harmful effect of an[y] error," the defendant is not entitled to relief. See Tenn. R. Crim. P. 36(a).

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE